**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEN WARNER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CITIZENS FINANCIAL GROUP, INC., BRUCE VAN SAUN, ERIC W. ABOAF, JOHN J. FAWCETT, and JOHN F. WOODS,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Ken Warner ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Citizens Financial Group, Inc., ("Citizens" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Citizens; and (c) review of other publicly available information concerning Citizens.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Citizens' securities between March 18, 2016, and March 29, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Citizens purportedly offers banking products and services through its two operating segments—Consumer Banking and Commercial Banking—with a focus on providing local delivery and a differentiated customer experience.

3.      On March 29, 2017, The Wall Street Journal ("WSJ") reported that the Company implemented a program that invited customers into branches for a financial checkup (or "Citizens Checkup") and that the Company claimed 400,000 such meetings occurred in 2016, but that eleven current and former Citizens branch employees in five states claimed that information about some meetings was fabricated by those employees or others as they struggled to meet goals set by the bank.

4.      On this news, the Company's stock price declined $0.54 per share to close at $34.49 per share on March 29, 2017, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

---

[1] "Defendants" refers to Citizens Financial Group, Inc., Bruce Van Saun, Eric W. Aboaf, John J. Fawcett, and John F. Woods, collectively.

operations, and prospects. Specifically, Defendants failed to disclose: (1) that Company employees were falsifying information related to the Citizens Checkup program; (2) that, as a result, the Company's reported Citizens Checkup figures were inflated; and (3) that, as a result of the foregoing, Defendants' statements about Citizens' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's securities are traded in this Judicial District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.      Plaintiff Ken Warner, as set forth in the accompanying certification, incorporated by reference herein, purchased Citizens common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements

and/or material omissions alleged herein.

12.     Defendant Citizens Financial Group, Inc. is incorporated in Delaware and its headquarters are in Providence, Rhode Island.  Citizens' common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CFG."

13.     Defendant Bruce Van Saun ("Van Saun") was the Chief Executive Officer ("CEO") of Citizens at all relevant times.

14.     Defendant Eric W. Aboaf ("Aboaf") was the Chief Financial Officer ("CFO") of Citizens until December 16, 2016.

15.     Defendant John J. Fawcett ("Fawcett") was the interim CFO of Citizens from December 17, 2016 until March 4, 2017.

16.     Defendant John F. Woods ("Woods") was the CFO of Citizens from March 4, 2017 through the end of the Class Period.

17.     Defendants Van Saun, Aboaf, Fawcett, and Woods (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Citizens' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Citizens purportedly offers banking products and services through its two operating segments—Consumer Banking and Commercial Banking—with a focus on providing

local delivery and a differentiated customer experience.

**Materially False and Misleading
Statements Issued During the Class Period**

19.     The Class Period begins on March 18, 2016.  On that day, the Company published

its fiscal year 2015 annual report.  Therein, the Company, in relevant part, stated:

> We're reinvesting the savings we find to support long-term growth. In 2015, for example, we opened a new data center in North Carolina, to further strengthen our infrastructure. We are also investing in online and mobile banking capabilities and in a new branch design that will support efforts to better serve our customers. And we started Citizens Check-Up, a program that helps us deepen relationships with customers by holding detailed conversations about how we can best meet their individual needs

20.     On October 21, 2016, the Company issued a press release entitled "Citizens

Financial Group, Inc. Reports Third Quarter Net Income of $297 Million; Diluted EPS of $0.56."

Therein, the Company, in relevant part, stated:

> **Update on Plan Execution**
>
> - Continued progress on initiatives to drive growth and enhance efficiency.
>
> - Consumer Banking – Performance paced by solid deposit and loan growth, improvement in conforming mortgage volume and strong salesforce expansion, with a record 47 net mortgage loan officer hires during the quarter as well as 11 financial consultants, resulting in nearly 500 mortgage originators and 350 financial consultants at quarter end. Our needs-based approach for serving retail customers, Citizens Checkup, has resulted in approximately 275,000 scheduled appointments year to date with high levels of customer satisfaction.
>
> - Commercial Banking — Delivered strong results in Capital Markets, foreign exchange and interest rate products. Generated 11% average loan growth from the year-ago quarter, reflecting continued progress in Mid-corporate and Industry Verticals, Commercial Real Estate and Franchise Finance. Treasury Solutions fee income up 10% from third quarter 2015.
>
> - Continue to deliver on efficiency and balance sheet optimization strategies.
>
>   - Tapping Our Potential ("TOP") initiatives remain on track; TOP II is delivering $95 million to $100 million of pre-tax benefits in 2016, while TOP III continues to project pre-tax revenue and expense benefits of $73 million to $90 million and $10 million to $15 million of tax benefits by the end of 2017.

- Initiatives to shift loan portfolio mix to higher-return categories continue to progress well; extracting capital from TDR and aircraft lease portfolios; managing deposit pricing to minimize cost while achieving growth objectives.

21.     On January 20, 2017, the Company issued a press release entitled "Citizens Financial Group, Inc. Reports Fourth Quarter Net Income of $282 Million and Diluted EPS of $0.55." Therein, the Company, in relevant part, stated:

**Update on Plan Execution**

Consumer Banking

- Performance paced by solid loan growth with continued traction in student, other retail unsecured and mortgage loans, with improved consumer loan yields tied to the benefit of improved mix.

- Sales force expansion continued in 2016 with an increase of 96 mortgage loan officers to 538 at year end, with 43 in fourth quarter, and the addition of 42 financial consultants to 362 at year end, with 12 in fourth quarter.

- Citizens Checkup, our needs-based approach for serving retail customers, has resulted in approximately 400,000 scheduled appointments in 2016, with high levels of customer satisfaction.

22.     On March 17, 2017, the Company published its fiscal year 2016 annual report. Therein, the Company claimed that "[i]n 2016, we continued to enhance our products and services to provide more customer-centric offerings," including "[e]volving our branch network and outreach efforts — modernizing our retail branch network to better meet customers' advisory needs, in conjunction with our Citizens Checkup program designed to assist customers with needs-based financial reviews to build and deepen relationships." The Company also claimed it had approximately "400,000 Citizens Checkup appointments to assess customer financial needs."

23.     The above statements identified in ¶¶19-22 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that Company employees were falsifying information related to the Citizens Checkup program; (2) that, as a

result, the Company's reported Citizens Checkup figures were inflated; and (3) that, as a result of the foregoing, Defendants' statements about Citizens' business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**<u>Disclosures at the End of the Class Period</u>**

24.    On March 29, 2017, The Wall Street Journal ("WSJ") reported that the Company implemented a program that invited customers into branches for a financial checkup (or "Citizens Checkup") and that the Company claimed 400,000 such meetings occurred in 2016, but that eleven current and former Citizens branch employees in five states claimed that information about some meetings was fabricated by those employees or others as they struggled to meet goals set by the bank.  In greater part, the WSJ reported:

> As part of its turnaround plan, Citizens Financial Group Inc. CFG **-1.54%** has touted a program that invites customers into branches for what the bank calls a financial checkup. It said 400,000 such meetings were scheduled last year.
>
> Eleven current and former Citizens branch employees in five states claim that information about some meetings was fabricated by those employees or others as they struggled to meet goals set by the bank.
>
> "For a week or so, I had my bankers [try to make] real appointments. No one was picking up the phone," said a former branch manager in Massachusetts, recalling when the "Citizens Checkup" program was introduced in February 2016. "So we put random people's names down and said, 'We have an appointment.'"
>
> After a fake appointment was supposed to have occurred, bankers sometimes marked that the customer didn't show up or attended but didn't sign up for any new products, the former employees said. One former Citizens branch manager in New York state recalled putting stars or exclamation points on falsified forms to make them look like authentic meeting notes.
>
> Citizens said in a statement that it has "no data to suggest that any aspect of the Citizens Checkup program was fabricated or falsified" and has "strict controls and standards to ensure that inappropriate behavior is detected and addressed."
> Brad Conner, head of consumer banking at Citizens, also said in a separate statement that, "We take every allegation seriously, and our chief conduct officer will lead a thorough review."
>
> The bank added any new program entails change and that, "as expected, a small number of colleagues have struggled in making the transition to having deep needs-based conversations."
>
> The former Citizens employees said they falsified information because of pressure

to meet expectations related to the program and time constraints from other banking responsibilities. They also said they believed that doing so wouldn't hurt customers.

In response, Citizens said, "While all of our colleagues go through significant training to be prepared for conducting a checkup, this new approach may not suit everyone, which may explain why you identified a handful of detractors."

Providence, R.I.-based Citizens has more than $149 billion in assets and 1,200 branches in 11 states, primarily in the Northeast; it is the 10th-largest U.S. commercial bank by total assets. Since going public in 2014, Citizens, a former unit of Royal Bank of Scotland Group PLC, has worked to turn around its business by improving profitability and increasing revenue.

Banks, investors and regulators have been scrutinizing bank-sales programs since a scandal over sales tactics erupted last fall at Wells Fargo & Co. Some firms have downplayed sales goals since then, though Citizens has continued to emphasize its appointment program and other sales goals, according to current and former employees.

In late March, bankers in Pennsylvania learned that they were expected to up their number of checkup appointments in April. The bank said "there was no formal raising of appointment expectations that we are aware of and no monthly targets are set across the bank."

The information that the current and former Citizens employees said was falsified doesn't involve opening customer accounts without consent, the practice that led to Wells Fargo's problems. That bank entered into a $185 million settlement over its sales practices and the public fallout led its chief executive to abruptly retire. But the claims by current and former employees that information was falsified at Citizens could raise questions about the accuracy of data the bank presented to investors and about the bank's corporate culture and internal controls.

"Investors are potentially hurt if executives go out and talk to the Street about basically phantom appointments that don't exist," said Clifford Rossi, a professor at University of Maryland's business school and a former bank-risk management executive.

The appointment-setting program was part of a broader push to bring in more than $60 million in new revenue for 2016. Citizens had total revenue of $5.3 billion last year. Last June, Mr. Conner told investors at a conference that the initiative was "near the top of the things that we're most excited about."

Mr. Conner added at that time, "We've contacted over 300,000—about 325,000 of our customers. We've been able to schedule 80,000 appointments for a checkup, and we're getting really great feedback from both our customers and our colleagues in terms of the receptivity from our customer base."

Citizens has also presented data on the appointments in materials accompanying quarterly earnings. The bank told The Wall Street Journal that figures on the program presented to investors weren't overstated and that those metrics were "not a key financial measure."

To make appointments, Citizens' staffers cold-call customers, the bank said. The goal, current and former employees said, was to eventually sell more banking products. When meetings occurred, bankers were told to ask questions such as: "Are you a caretaker for an aging parent?" or "Are you planning for an upcoming divorce?"

Citizens' push for customer appointments reflects Chief Executive Bruce Van Saun's stated desire for branches to become advice centers.

The bank said a two-part phone survey—conducted first in late 2015 during a pilot of the program and from late 2016 to early 2017—of nearly 1,000 customers who were called for a checkup appointment found 95% who kept the appointment said the meeting was useful. The bank also said in response to questions from the Journal that surveys of its own branch employees haven't turned up evidence of widespread staff dissatisfaction with the checkups.

The 11 current and former branch employees, however, said the program ran into problems. For starters, few customers picked up the phone—and of those that did, not many wanted an appointment, the bankers said.

A former Citizens banker in New York state said he was initially enthusiastic after going through specialized training. But no matter how he pitched it in calls in the spring of 2016, "people still felt it was a telemarketer call," said the banker. "We feel good about our sales practices, and the checkup approach is an important element of why we do," the bank said.

Bankers, who were often told by managers to make 25 cold calls a day, were given a script, some of the current and former bankers said. This included wording to "overcome objections" to a potential meeting, according to a copy of the script reviewed by the Journal. If a customer wasn't interested, the bank suggested in the script that the banker say: "Just like you would meet with a doctor or dentist every six months or year it is important to review your financial health as well."

At some branches, calls were expected to yield between 10 and 15 checkup appointments per banker per week, some of the current and former bankers said. These appointments were tracked as part of a performance-measurement system.

Bankers said there was an intense focus on checkup appointment statistics. "Corporate only looked at the numbers," another former New York state banker said. "As long as those numbers looked presentable, the pressure was off." Like other former employees, this banker said the false appointments would help bankers "look good without any customers being hurt."

The bank disputes the goal figures for calls and appointments. It said that, while individual branches set their own expectations, it is more typical for 30 calls and two kept appointments a week to be expected of bankers.

Nine current and former employees said they or others would typically enter false information into two computer systems, one tracking calls to customers, the other for appointments made, former bankers said. First, employees would mark that they called customers even though they hadn't. Next, the employees said, they or others would enter fake appointments into the system using the names of actual customers.

Two former Citizens bankers said they often marked that a customer didn't show up for the checkup or didn't buy any products. Some bankers said they pulled up customer financial records so they could create believable answers to put on paper forms about the supposed meetings.

The bank said it had worked with a consultant to track the progress of its program against those of other banks with similar arrangements. It added this didn't show anything amiss.

One former banker said there was encouragement from managers to lie about calls and appointments by their managers. "We didn't have any time to make calls," one former banker in Rhode Island said. This banker estimated making four real "checkup" calls over the course of 2016 but reported making hundreds within the bank's system, the banker said. "We were told how many appointments we would have to have and how many contacts we had to make it believable by the branch manager," the person said.

The bank responded that "checkup activities are governed by strong controls to ensure that numbers are accurate, with close oversight at various levels starting with the branch managers up to executive management."

25.     On this news, the Company's stock price declined $0.54 per share to close at $34.49 per share on March 29, 2017, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Citizens' securities between March 18, 2016, and March 29, 2017, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or

had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Citizens' common stock actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Citizens shares were traded publicly during the Class Period on the NYSE.  As of February 1, 2017, Citizens had 509,107,893 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Citizens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

29.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Citizens; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

32.    The market for Citizens' securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Citizens' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Citizens' securities relying upon the integrity of the market price of the Company's securities and market information relating to Citizens, and have been damaged thereby.

33.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Citizens' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Citizens' business, operations, and prospects as alleged herein.

34.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Citizens' financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was

revealed.

## LOSS CAUSATION

35.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

36.    During the Class Period, Plaintiff and the Class purchased Citizens' securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

37.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Citizens, their control over, and/or receipt and/or modification of Citizens' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Citizens, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

38.    The market for Citizens' securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Citizens' securities traded at artificially inflated prices during the Class Period.  On March 1, 2017, the Company's stock price closed at a Class Period adjusted high of $39.59 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of Citizens' securities and market information relating to Citizens, and have been damaged thereby.

39.    During the Class Period, the artificial inflation of Citizens' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Citizens' business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Citizens and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

40.    At all relevant times, the market for Citizens' securities was an efficient market for the following reasons, among others:

(a)    Citizens stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Citizens filed periodic public reports with the SEC and/or the NYSE;

(c)    Citizens regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Citizens was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

41.    As a result of the foregoing, the market for Citizens' securities promptly digested

current information regarding Citizens from all publicly available sources and reflected such information in Citizens' stock price. Under these circumstances, all purchasers of Citizens' securities during the Class Period suffered similar injury through their purchase of Citizens' securities at artificially inflated prices and a presumption of reliance applies.

42.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

43.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Citizens who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

44.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Citizens' securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

46.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Citizens' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Citizens' financial well-being and prospects, as specified herein.

48.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Citizens' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Citizens and its business

operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

49.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

50.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Citizens' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.    As a result of the dissemination of the materially false and/or misleading

information and/or failure to disclose material facts, as set forth above, the market price of Citizens' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Citizens' securities during the Class Period at artificially high prices and were damaged thereby.

52.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Citizens was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Citizens securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

53.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
#### Violation of Section 20(a) of The Exchange Act
#### Against the Individual Defendants

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     Individual Defendants acted as controlling persons of Citizens within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's

operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

58.     As set forth above, Citizens and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  April 25, 2017                         **GLANCY PRONGAY & MURRAY LLP**


                                               By:   _s/ Lesley F. Portnoy_
                                               Lesley F. Portnoy (LP-1941)
                                               122 East 42nd Street, Suite 2920
                                               New York, New York 10168
                                               Telephone: (212) 682-5340
                                               Facsimile: (212) 884-0988
                                               lportnoy@glancylaw.com

                                                      -and-

                                               **GLANCY PRONGAY & MURRAY LLP**
                                               Lionel Z. Glancy
                                               Robert V. Prongay
                                               Casey E. Sadler
                                               Charles H. Linehan
                                               1925 Century Park East, Suite 2100
                                               Los Angeles, California 90067
                                               Telephone: (310) 201-9150
                                               Facsimile: (310) 201-9160

                                               *Attorneys for Plaintiff*

## SWORN CERTIFICATION OF PLAINTIFF

## CITIZENS FINANCIAL GROUP, INC. SECURITIES LITIGATION

I, Ken Warner, individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.     I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.     I did not purchase **CITIZENS FINANCIAL GROUP, INC.,** the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.     My transactions in **CITIZENS FINANCIAL GROUP, INC.** during the Class Period set forth in the Complaint are as follows:

       (See attached transactions)

5.     I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.     I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

4/14/2017
_____
Date

DocuSigned by:

*Ken Warner*

00A8217F2548499...

Ken Warner

**Ken Warner's Transactions in**
**Citizens Financial Group, Inc. (CFG)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 03/06/2017 | Bought | 8,000 | $38.0000 |