**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*In re Citizens Financial Group, Inc. et al*

Master File No. 1: 17-cv-03004-GBD

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Hon. George B. Daniels

Lead Plaintiffs Ken Warner and Richard Grace ("Plaintiffs"), on behalf of themselves and all other persons and entities similarly situated, by and through their undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Citizens Financial Group, Inc., ("Citizens" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Citizens; (c) investigative interviews with persons having first-hand knowledge of the Company's operations; and (d) review of other publicly available information concerning Citizens.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities who purchased or otherwise acquired Citizens' securities between March 18, 2016, and March 29, 2017, inclusive (the "Class Period"), against the Defendants,[1] seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Citizens describes it business as offering banking products and services through its two operating segments—Consumer Banking and Commercial Banking—with a focus on providing local delivery and a differentiated customer experience. Citizens offers a range of retail and commercial banking products and services to individuals, small businesses, middle-market companies, large corporations and institutions. As of December 31, 2016, Citizens had approximately 3,200 ATMs and approximately 1,200 branches in 11 states in the New England, Mid-Atlantic and Midwest regions. Consumer Banking products and services include everyday banking, consumer lending, residential mortgage, home equity, indirect auto finance, student lending, unsecured product finance lending, wealth management and small business banking. In Commercial Banking, Citizens offers corporate, institutional and not-for-profit clients a range of

[1] "Defendants" refers to Citizens Financial Group, Inc., Bruce Van Saun, Eric W. Aboaf, John J. Fawcett, and John F. Woods, collectively. *See also* ¶¶22-27, *infra*.

wholesale banking products and services, including lending and deposits, capital markets, treasury services, foreign exchange and interest rate products and asset finance

3. As of December 31, 2016, Consumer Banking accounted for $55.1 billion, or 55%, of average loans and leases (including loans held for sale) in Citizens' operating segments. Commercial Banking accounted for $45.9 billion, or approximately 45%, of average loans and leases (including loans held for sale) in Citizens' operating segments as of December 31, 2016.

4. This action presents a straightforward case of securities fraud: During the Class Period, Defendants issued inflated metrics regarding a Consumer Banking revenue initiative that invited customers into branches for a financial checkup (or "Citizens Checkup") and misrepresented the success of the program, the number of appointments scheduled, the number of Citizens Checkup appointments held, and, ultimately, the revenue-driving potential of the program.

5. According to Defendants, the Citizens Checkup program was designed to serve as a revenue driver by targeting existing customers, particularly "Affluent" and "Mass Affluent" customers who would, upon engaging with personal bankers, learn about, and ideally sign up for, the Company's additional, higher revenue banking services. The Company defined Affluent customers as clients with liquid assets of $500,000 to $2 million and Mass Affluent customers as clients with liquid assets of $100,000 to $500,000.

6. Defendants repeatedly updated the market by touting the success of the Citizens Checkup program in investor presentations, press releases, and during conference calls. Defendants claimed that the program was experiencing ever growing number of appointments (up to 400,000 appointments scheduled by the end of the Class Period) and enjoyed high customer satisfaction rates (purportedly reaching 78% of customers who were "very to completely satisfied"). The Company's investor presentations, which were also filed with the SEC on Form 8-Ks for quarterly earnings calls and presentations and investment bank conferences, indicated that Citizens Checkup was a major part of a revenue driving initiative, which purportedly "[d]elivered over $60 million" – or "105 million in annual pre-tax benefit for

2016[.]". According to the Company, the Citizens Checkup program was "near the top of the things that we're most excited about."

7. These claims, however, painted a highly misleading picture of the Citizens Checkup program. Instead, branch employees felt pressured by their branch managers, who were in turn pressured by regional management, to make an unrealistic number of appointments with customers who felt indifferent and, even if they did schedule an appointment, rarely showed up. Apart from feeling forced to pressure reluctant customers into booking appointments that were unlikely to be kept, employees were also regularly pressured by their own branch and regional management to falsify their contacts and appointments in the Citizens Checkup program.

8. Thus, the façade of success that Defendants had constructed around the Citizens Checkup program cracked on March 29, 2017, when *The Wall Street Journal* ("WSJ") published a damning investigative report revealing the truth of the program (the "WSJ article"). As the WSJ article reported, the Company claimed to have scheduled 400,000 Citizens Checkup appointments in 2016. But eleven current and former Citizens branch employees in five states reportedly told WSJ that much of the information about the meetings was fabricated by those employees and others as they struggled to meet goals set by the bank. Because many customers did not answer their phone or declined to participate in a Citizens Checkup meeting, employees fabricated names and appointments to make quotas set by the Company.

9. According to the WSJ article, the Citizens Checkup appointments were tracked as part of a performance-measurement system, and according to Citizens employees, the Company had an intense focus on Citizens Checkup appointment statistics. Nine of the current and former Citizens employees interviewed by WSJ stated that they entered false information into two systems – one tracking the number of calls made, and one tracking the number of appointments. The employees or their colleagues would report calls that in fact had not been made, and/or would use actual customer names to enter fake appointments. Some bankers would mark the customers as no shows or declined to purchase products. One former banker claimed that employees were encouraged by managers to falsify the calls and appointments with a set number of calls and appointments that would meet desired quotas.

10. For its part, the Company initially insisted to the WSJ that "checkup activities are governed by strong controls to ensure that numbers are accurate, with close oversight at various levels starting with the branch managers up to executive management." According to the WSJ article, Citizens said in a statement that it has "no data to suggest that any aspect of the Citizens Checkup program was fabricated or falsified" and has "strict controls and standards to ensure that inappropriate behavior is detected and addressed."

11. According to the WSJ Article, Citizens also tried to attribute the actions to a few rogue employees, telling WSJ "While all of our colleagues go through significant training to be prepared for conducting a checkup, this new approach may not suit everyone, which may explain why you identified a handful of detractors." In a separate statement to WSJ, Defendant Conner stated that any new program entails change and that, "as expected, a small number of colleagues have struggled in making the transition to having deep needs-based conversations."

12. Citizens further insisted to WSJ that in materials accompanying quarterly earnings, "figures on the program presented to investors weren't overstated . . . ."

13. Upon learning of the WSJ findings, the Company's stock price declined $0.54 per share to close at $34.49 per share on March 29, 2017, on unusually heavy trading volume. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

14. On April 20, 2017, the Company reported fiscal first quarter 2017 earnings and hosted a conference call with investors and analysts. During the call, Defendant Conner defended the Citizens Checkup program as an important way to serve customers and announced that it had commenced a thorough review of the program. The Company backed away from its initial position that there was "no data to suggest that any aspect of the Citizens Checkup program was fabricated or falsified" or blaming a few rogue employees. Instead, Defendant Conner stated they had not identified any instances of customer harm and stated "we're open to things we learn from the review that we can adjust to become even better."

15. Despite telling WSJ that "figures on the program presented to investors weren't

overstated" in the WSJ article, the Company stopped reporting any metrics related to the Citizens Checkup programs calls and appointments after the WSJ article was published. The Company's first quarter 2017 earnings release stated only generally that, "We continue to see strong momentum in our efforts to use the Citizens Checkup program to build and deepen relationships with our Consumer customers" and that "Customer satisfaction remains high and program metrics continue to track well against expectations." Similarly, the first quarter 2017 investor presentation merely made the vague statements that "Citizens Checkup continues to help build stronger relationships with customers and maintains high levels of customer satisfaction."

## JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's securities are traded in this Judicial District.

19. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

20. Lead Plaintiff Ken Warner, as set forth in his previously filed certification, incorporated by reference herein, purchased Citizens common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading

statements and/or material omissions alleged herein.

21. Lead Plaintiff Richard Grace, as set forth in his previously filed certification, incorporated by reference herein, purchased Citizens common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22. Defendant Citizens Financial Group, Inc. is incorporated in Delaware and its headquarters are in Providence, Rhode Island. Citizens' common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CFG."

23. Defendant Bruce Van Saun ("Van Saun") was the Chief Executive Officer ("CEO") of Citizens and Chairman of the Company's Board of Directors since October 2013. From October 2009 through October 2013, Defendant Van Saun served as the RBS Group Finance Director and was a member of its board of directors. From 1997 to 2008, Defendant Van Saun held a number of senior positions with Bank of New York and later Bank of New York Mellon, including Vice Chairman and Chief Financial Officer.

24. Defendant Eric W. Aboaf ("Aboaf") was the Executive Vice President and Chief Financial Officer ("CFO") of Citizens from April 6, 2015 through his resignation effective December 16, 2016. Prior to joining the Company, Defendant Aboaf was Global Treasurer at Citigroup Inc. since 2009, where he was responsible for managing the company's balance sheet, ensuring strong liquidity and optimizing the capital structure. Prior to becoming Global Treasurer, Defendant Aboaf served as the CFO for both the Institutional and Consumer bank segments at Citigroup Inc, Global CFO for the Institutional Clients Group, and CFO for the North American Consumer Group.

25. Defendant John J. Fawcett ("Fawcett") was the interim CFO of Citizens from December 17, 2016 until March 4, 2017, as well as CFO of RBS North America and then Citizens from November 2007 to April 30, 2015. Defendant Fawcett held various roles at Citigroup for over 20 years, including CFO for Trading and Capital Markets; Head of Planning and Analysis for the Global Corporate and Investment Bank; and CFO for the Global Transactions Services Business.

26. Defendant John F. Woods ("Woods") was the Executive Vice President and CFO of Citizens from March 4, 2017 through the end of the Class Period. Defendant Wood's responsibilities include Financial Planning and Analysis, Controller, Investor Relations, Strategy, Treasury, Tax and Capital Management functions as well as the business line finance groups. Before joining Citizens, Woods was Mitsubishi UFJ Financial Group, Inc. ("MUFG")'s CFO of the MUFG Americas Holdings Corporation, which operates MUFG Union Bank, since 2013. Defendant Woods was Vice Chairman and CFO for the predecessor company of MUFG Union Bank since December 2009.

27. Defendant Brad L. Conner ("Conner"), the Company's Vice Chairman of Consumer Banking throughout the end of the Class Period. Defendant Conner is responsible for Retail Banking, Business Banking, Wealth Management, Home Lending Solutions, Auto Finance and Education Finance, as well as the Consumer Phone Bank and online channels. Before joining the Company in 2008, Defendant Conner was President of JP Morgan Chase & Co.'s Home Equity and Mortgage Home Loan Direct business.

28. Defendants Van Saun, Aboaf, Fawcett, Woods, and Conner (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Citizens' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

29. Citizens was first established in the United States in 1828. From 1988 to September 2014, Citizens was a majority-owned subsidiary of The Royal Bank of Scotland Group plc ("RBS"). In February 2013, RBS announced its intention to launch an initial public offering of Citizens and eventually fully divest its stake in Citizens. On September 22, 2014, the SEC declared Citizens' Registration Statement effective and Citizens' IPO was completed on September 28, 2014. Through a series of follow-on offerings in March, July and November of 2015, Citizens fully separated from RBS.

30. Under RBS, Citizens' growth (and risk) was constrained because RBS was majority-owned by the British government since the 2008 financial crisis, and was under pressure to "de-risk" by shrinking its balance sheet. Citizens therefore experienced underinvestment in technology and staffing, limiting its growth and returns as compared to other public banking institutions.

31. Defendant Van Saun was Group Finance Director of RBS and became CEO of Citizens in October 2013. Defendant Van Saun was tapped to lead Citizens through the IPO process and to implement a turnaround plan to strengthen Citizens as an independent public company. After the September 2014 spinoff, Citizens experienced strong growth as it increased its offerings and improved profitability. As part of its turnaround plan, among other things, the Company increased its commercial lending activity, implemented new cost control measures, and looked to grow its Consumer Banking services under Brad L. Conner, the Company's Vice Chairman of Consumer Banking.

32. In the Company's Registration Statement filed on Form S-1 with the SEC on May 12, 2014, repeatedly emphasizing the importance of cross-selling products. Among other things, the Registration Statement touted that "[o]ur Consumer Banking cross-sell efforts have improved to 4.9 products and services per retail household as of December 31, 2013 compared to 4.2 products and services as of December 31, 2009." The Registration Statement also boasted that "24% of our deposit customers now have a credit card relationship with us, more than double the

percentage at the beginning of 2009. This was achieved by instituting more focused cross selling efforts in our branch network, which generates substantially all of our credit card origination volume."

33. Cross-selling has been called a "Would you like fries with that" approach in which financial services firms look to obtain more revenue from existing clients by offering additional services to them. Indeed cross-selling services has become an integral part of modern consumer banking, putting intense pressure on bankers, who are views as salespeople, to offer additional services to customers. As former CEO of Royal Bank of Canada, John G. Taft stated in the *The New York Times* article entitled, "Want to Change Banking Culture? Stop Talking About Cross-Selling", there is nothing inherently wrong with trying to offer solutions to customers and help them manage more of their assets and liabilities. However, as Taft explained:

> It's also really good for the financial institution. The more products and services individual customers use and pay for at their bank, the more profitable they are to the bank.
>
> Which is where the problem lies: The phrase "cross-selling" is all about profitability, not about meeting client needs. When employees hear it over and over in meetings, and read it repeatedly in memos and emails, they know what it really means.
>
> Banks aren't credible when they blame fraud on a small number of employees who allegedly didn't live up to the bank's culture. When thousands of employees are fired for unethical behavior, that points to a systemic problem — a problem with controls, a problem with incentives and, almost certainly, a problem with culture.
>
> And let's face it, when it comes to culture, words matter.
>
> These days, forward-looking financial services firms are doing everything they can to evolve from being sales-oriented, product-centric businesses to more consultative, client-centric businesses. Calling employees salespeople, the branches they work in stores, the people they are serve customers and the services they offer products is simply out of touch.

34. While widespread media attention and regulatory scrutiny has intensified in the wake of the Wells Fargo fake account scandal that came to light in September 2016, the intense pressure on retail bankers to increase sales had been ongoing in the consumer banking industry for many years. Indeed in April 2017, Morgan Stanley agreed to pay $1 million to the state of

Massachusetts to settle allegations that high pressure sales contests rewarded employees for encouraging wealthy clients to borrow against their own brokerage accounts. The complaint against Morgan Stanley, which was filed in October 2016, noted that Morgan Stanley had a firmwide culture that encourages the cross-selling of certain products to its wealth management clients and that the greater emphasis on cross-selling arose as a result of the 2008 financial crisis, in which regulatory changes and trends led Morgan Stanley to focus more on the retail rather than commercial clients.

35. Prior to, and throughout the Class Period, Defendants also stressed the importance of, and increased emphasis on, cross-selling both internally to its employees and externally to investors. Branch employees were pressured to perform.

36. According to an October 27, 2014 interview with *Fortune*, Defendant Van Saun indicated that Citizens' turnaround plan for the Consumer Banking side included improving the returns in mortgage, business banking, and, importantly, cross-selling wealth management advice and services to the customer base. The turnaround plan appeared to have been successful. For fiscal year 2016, the Company reported total revenues of $5.3 billion, which increased by $431 million, or 8.9% from 2015, and 8% average loan growth across business segments. The Company's 2016 Annual Report indicated that Citizens had $54.7 billion in consumer banking loans, with 7% growth in average consumer banking laons. According to a May 16, 2017 article by *The Motley Fool* entitled, "Citizens Financial Group Is Moving Out of Its Turnaround Phase, Says CEO Bruce Van Saun," Citizens purportedly grew average loans on a year-over-year basis by 7.7% across business segments, compared to a 5.4% peer group average. The article also noted that Citizen's purported 8.9% revenue growth in 2016 outpaced the 5.4% revenue growth for its average competitor. However, according to *The Motley Fool*, industry-wide, loan growth rates at commercial banks has declined since the end of 2016. Moreover, consumer banking institutions such as Citizens were subject to significant interest rate risk. For example, if interest rates were to rise, depositors would demand better rates on their savings and checking accounts, forcing banks to raise interest rates or risk losing significant deposits.

37. In late 2014, shortly after its IPO, Citizens launched a turnaround initiative called

Tapping our Potential ("TOP"). According to the Company's 2016 Annual Report, TOP was purportedly designed to improve the effectiveness, efficiency and competitiveness of the Citizens franchise. The Company launched its second initiative, TOP II in mid-2015, which purportedly delivered a $105 million pre-tax benefit in 2016.

38. Citizens Checkup was launched in February 2016 as a TOP II program intended to help Citizens "deepen" relationships with customers, particularly wealthy customers, by inviting them in for appointments to review their banking needs and discuss ways to cross-sell services such as wealth management and mortgage financing. Touted as a way to bring customers back into branch locations instead of doing all their banking online or through smartphones – and thus creating the opportunity to sell more of the bank's services – Vice Chairman of Consumer Banking, Defendant Conner, described Citizens Checkup on June 1, 2016 as "near the top of the things that we're most excited about."

**Confidential Witnesses Confirm the WSJ Article's Reporting on the Citizens Checkup Program**

39. Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, including information in part obtained from former employees of Citizens. Information provided by the former employees is reliable and credible because: (a) each of the witnesses worked at Citizens during the Class Period; (b) each witness stated that she/he had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities show that they had personal knowledge of the information provided; (d) the witness accounts corroborate one another; and (e) the witness accounts are corroborated by other information alleged herein.

40. Confidential Witness 1 ("CW1") was an Assistant Vice President and Branch Manager at Citizens, from approximately January 2015 until March 2016 at two different branches in Boston. CW1 reported to Senior Vice President and Regional Manager Anna Greener, who reported to Executive Vice President Kimberly Dee. CW1 managed approximately 6-7 employees at two different Citizens branches in the Boston area, at different times during CW1's tenure.

41. According to CW1, there was great pressure by branch and regional management

to produce numbers such that "[t]hey would write you up if you didn't [meet goals or get numbers] . . . ." CW1 stated that the culture of Citizens was always fueled by such pressure.

42. According to CW1, there was a lot of pressure on Citizens employees in the Massachusetts region, generally, and CW1 experienced severe stress at Citizens. In fact, CW1 recalled coming down with hives as a result of the stress CW1 experienced at Citizens.

43. CW1 explained that "there was a big focus on us as a region getting ahead of other regions [at that time]." CW1 recalled that Pennsylvania was ranked number one in overall sales and Boston was number eight. CW1 recalled that there was a constant push and pressure to produce in CW1's region, for that reason. "There was a big focus on Boston needs to get ahead…we had to show for it," CW1 explained. CW1 explained that the Boston area had pressure "to get ahead" of all sales goals in general.

44. CW1 explained that "You had to do what they set in place" because the pressure was there to produce. According to CW1, it was a constant "survival mode," because of the pressure from the constant conference calls, emails, and micro management. CW1 did not even have time to use the restroom at times. CW1 explained, "So that's how they pressure you. I know I did very well but still felt like crap… it was the worst feeling."

45. Although the official launch of the Citizens Checkup Program was in February 2016, CW1 stated that the program preparation started in late 2015. According to CW1, managers were briefed on the program and "how to coach it [to bank employees]." CW1 explained that in the past Citizens had asked bankers to make calls and attempt to get customers into the branches, but Citizens decided that instead of calling people for specific reasons such as Home Loans or Checking accounts, they would call them for broader "Financial Reviews," under the Citizens Checkup Program. Therefore, according to CW1 the program was relaunched as "new," but stated that "honestly it was nothing significantly different than what we were doing [in the past],"

46. CW1 recalled "constant conference calls" at Citizens covering various topics and expectations during CW1's tenure, including the Checkup program after it started. According to CW1, it seemed like "every day was a fire drill" because expectations of home loan and

checking account applications had to be fulfilled each day, on top of the appointment requirements for the Checkup program. CW1 felt the need to "scramble" constantly to meet unrealistic expectations. CW1 jokingly recalled feeling so pressured to meet Citizens' goals that CW1 started to call friends to ask them to open accounts at the bank. CW1 stated that after hours or during social dinners with other branch managers and employees, CW1 would commiserate with themabout the stress they experienced at Citizens.

47. The conference calls were attended by all branch and regional managers, and Dee on occasion. CW1 believed that Dee was a "messenger" of the company culture and was pressured by her management to place pressure on the branches. Based on CW1's observations during the calls, CW1 believed that the pressure originated from corporate management and the Small Business Divisions, down to Regional management, and then to branch employees.

48. CW1 explained that if an employee consistently fell short and missed appointment and sales goals, they would be written up, documented, and placed into a performance plan for improvement. During CW1's tenure, certain employees had to stay late for mandatory call nights. CW1 recalled that call nights occurred on every Tuesday, and if goals were not met on that night, employees would have to stay an additional night to assure that goals were met. It was CW1's belief that Citizens no longer has "mandatory call nights" due to complaints that it felt like "punishment." According to CW1, such "punishments" and write-ups were for overall sales goals. If an employee was written-up, there was the potential repercussion of not receiving incentive payments tied to various sales goals. When this occurred, the employee would have their incentive payout taken away and still be required to meet their sales goals.

49. CW1 recalled that the approximate goal for CW1's branches was to book 2-3 Citizens Checkup appointments per day, and to make 20-25 calls per day to potential Citizens Checkup customers. CW1 explained that it would take approximately 20-25 calls to book 2-3 appointments. CW1 admitted to fabricating the number of Citizens Checkup appointments made on various occasions and stated that other employees at CW1's branches also fabricated appointment data. Based on CW1's observation, CW1 believed that at least half of the total

appointments in CW1's region were fake. It was CW1's belief that the pressure that led to the Citizens Checkup fabrication had a lot to do with branches being understaffed and corporate having unrealistic expectations. CW1 knew that appointment information was being fabricated because the number of appointments that were logged at CW1's branches was not an accurate reflection of the recorded numbers.

50. CW1 reported that during CW1's tenure, information and data regarding the Citizens Checkup program was mainly communicated during near-daily conference calls and regular emails with regional managers. CW1 further reported that Citizens Checkup program expectations were also discussed during these near-daily calls.Although CW1 was never directly instructed to fabricate Citizens Checkup contacts or appointments, CW1 understood that the constant conference calls and pressure pertaining to the Checkup program, and at Citizens overall, meant that branches needed to produce the results desired by management. CW1 explained that fabricating the data to meet the quotas was a matter of survival.

51. CW explained that the branch had Universal Bankers would wear two hats; one hat as a Teller and another hat as a Banker. They had to conduct the duties of both hats/roles during one work shift and be expected to get appointments for the Checkup program on top of every other assignment.

52. CW1 recalled approaching a Universal Banker once to remind them that they had to get their 2-3 appointments, and the Banker would respond, "I've been at the window all day [emphasizing the lack of time to get appointments]." CW1 explained that Citizens "had a lot of universal bankers, a banker and a teller, one person for two roles. There was a challenge there because we would have busy, busy branches." CW1 explained that there was no time for branch employees to make calls in order to get appointments and stated that "that was the situation for a lot of people [employees] there."

53. Confidential Witness 2 ("CW2") was an Assistance Vice President and Multi-Site Manager for various branches in the Ohio region from approximately 2012 to April 2016.

54. According to CW2, Citizens employees in the Ohio region were required to have 10 Citizens Checkup appointments per week, but in reality, each employee might have about 1-2

appointments per week. CW2 stated that a few more experienced or more successful salespersons might get 6-7 appointments per week, but that was not common.

55. According to CW2, once contacts and scheduled appointments were recorded into the system, they were treated as Citizens Checkup successes. For example, CW2 did not believe there was any way to track when a Citizens Checkup appointment client was a "no-show," which was often the case.

56. Confidential Witness 3 ("CW3") was a Vice President and Branch Manager at Citizens from approximately September 2011 until August 2016, in Needham, Massachusetts. Prior to this position, CW3 worked at a number of other consumer banks, and also worked as a banker, assistant branch manager, and manager for approximately four years at Citizens.

57. It was CW3's opinion that all major banks are the same and engaged in similar activities as what Wells Fargo did before they were caught. CW3 stated that many banks have employees that open accounts to receive incentives and to make their region "look good." According to CW3, there might be a penny in a customer account that could go unnoticed until fees start appearing. CW3 explained that those accounts were simply made up by personnel for quotas or to make numbers. Based on CW3's experience, CW3 believed that such activities are common in the banking industry generally.

58. Although CW3 was never directly asked to inflate call or appointment numbers regarding the Citizens Checkup program, CW3 stated there was pressure from the top down, to get "numbers," as in Checkup appointments. According to CW3, the pressure originated from the executive level, down to retail directors, then down to regional managers, then to branch managers and branch employees.

59. CW3 was aware that employees had "fake checkups" in CW3's branch and other branches in the Boston area. CW3 knew that fake appointments in CW3's branch occurred because Checkup meetings would be scheduled but would never happen. CW3 was very confident that meetings were marked down that never happened "everywhere." While CW3 declined to provide more specifics, CW3 was friendly with other branch manager in the Boston metropolitan area.

60. CW3 estimated that customers would show up for appointments or expressed interest in the Citizens Checkup program approximately 30% of the time. Although CW did not personally participate in any fabrication, CW3 stated that a fake checkup included marking a loan or debit card appointment down as a "Checkup." According to CW3, employees were mandated to enter the contacts they made into the company computer system within 24 hours.

61. CW3 did not believe that customers used or purchased more products after Checkup appointments. CW3 was not aware of any quality control mechanisms in place to assure that the reported figures were accurate. However, CW3 stated, "There is a lot of willful blindness [in the banking industry], though." CW3 recalled receiving an email that was sent from corporate that detailed expectations and guidelines for the number of Checkups they wanted from each branch but could not recall the specifics about expected targets.

62. According to CW3, monthly branch meetings were called, "meetings in a box", which consisted of Powerpoint presentations or Word documents that were provided to tellers and salespersons regarding the "hot topic" or product during that period of time. CW3 recalled having at least one "meeting in a box" about the Citizens Checkup program.

**Materially False and Misleading**
**Statements Issued During the Class Period**

63. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

64. The Class Period begins on March 18, 2016. On that day, the Company published its fiscal year 2015 annual report. Therein, the Company, in relevant part, stated:

> We're reinvesting the savings we find to support long-term growth. In 2015, for example, we opened a new data center in North Carolina, to further strengthen our infrastructure. We are also investing in online and mobile banking capabilities and in a new branch design that will support efforts to better serve our customers. And we started Citizens Check-Up, a program that helps us deepen relationships with customers by holding detailed conversations about how we can best meet their individual needs.

65. On May 17, 2016, Defendant Van Saun presented at the Barclays Americas Select Conference noted that what the Company's third revenue initiative, TOP III was "going to focus on is more efficiencies, further improvement in terms of balance sheet management, further efforts towards cross-sell."

66. The above statements identified in ¶¶64-65 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

67. During the May 17, 2016 conference Defendant Van Saun also emphasized cross selling among wealth management:

> On the consumer side I think wealth is the thing that's positioned to start to gain traction the fastest. So this fellow, John Bahnken who came in, has started recruiting some great people. And so the amount of people in the right positions in the branches, from financial consultants all the way down to licensed bankers, has started to move higher fairly quickly under his leadership. We have something called these qualified leads that come out of the branch system. We're doing more interaction with the customer and so we're presenting more wealth leads over to

> those wealth advisors. And getting that equation right is really important, because if you look at our customer base we have one of the more affluent customer bases in our peer group. And then if you look at our wealth penetration, we're an also-ran by far. We are 10th out of 10. So getting that equation right and closing that gap is very important to achieving some of our revenue potential and I'm optimistic that we're on a good trajectory there.
>
> * * *
>
> And I'd say those are -- growing the accounts and the pricing. And then just looking for better cross-sell. Just looking for better penetration, particularly on the commercial side, is the other kind of big prize. Ultimately, that's the biggest thing is if we can start to penetrate more of the customer base. We're probably slightly over 1% national middle market market share and our peer average is probably 2%. And that's a $300 million business. So if we can move that one higher there's a lot of potential there. So anyway, Don's very focused on that. There's a fellow, Mike Cummins, who also was at Chase and worked with Don. He leads the business on a day-to-day basis so I have good hopes there as well. Okay?

68. The above statements identified in ¶67 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

69. On June 1, 2016, Defendant Aboaf and the Company's Vice Chairman of Consumer Banking, Defendant Conner, spoke to investors and analysts at the Deutsche Bank Global Financial Services Conference. During the conference, Defendant Conner touted the number of customers the Citizens Checkup program had reached, stating:

> I was going to talk very briefly on two initiatives that we have underway inside of the consumer bank. The first is something that we call Citizens Checkup and if you look at the long list of things that we have underway, I would probably put this very near the top of the things that we're most excited about. It really hits on two big opportunities for us. One is deepening our relationships with our

> customers and another is addressing the trend that's hitting all of consumer banking, which is customers are coming into branches less and less all the time as they do things [mobily] and online.
>
> So the quick explanation of what Checkup is it's our outreach to our customers to invite them into our branches to have a discussion with us about their needs and the reason we call it Checkup is sort of the simple concept of the way we position it with both our colleagues and our customers is much the way our customers would go into their doctor for their annual physical checkup. We invite them to come in for an annual financial checkup with their trusted advisor from a banking perspective.
>
> We're very early into this initiative. It's one of our Top II initiatives, but we're very, very excited about the opportunity. So we piloted it last year. We launched the program in February of this year. So we're about three or four months into it. ***So far we've contacted over 300,000 -- about 325,000 of our customers. We've been able to schedule 80,000 appointments for a checkup and we're getting really great feedback from both our customers and our colleagues in terms of the receptivity from our customer base. So we think it will continue to help us, drive performance, and deepen our relationships with our customers.*** I'm very excited about it.

70. During the June 1, 2016 conference, Defendant Conner further stated, "One of the things I didn't talk about too much on that Citizens Checkup concept should really drive and it is starting to drive a lot more referrals over to our financial consultants and wealth advisors."

71. During the June 1, 2016 conference Defendants Aboaf and Conner also provided a presentation deck which was also attached to a Current Report filed with the SEC on Form 8-K on June 1, 2016 ("June 1, 2016 presentation"). With respect to the TOP II program overall, the June 1, 2016 presentation informed investors that "Consumer distribution channel effectiveness" and "Commercial and Consumer cross-sell" were expected to deliver approximately $30-40 million in revenues for 2016:

**Have developed continuous improvement mindset: TOP Programs**

Tapping Our Potential (TOP) programs driving revenue growth and expense efficiencies

| TOP I | TOP II | Initial thoughts on TOP III |
|---|---|---|
| Launched first half 2014<br>Achieved $200 million annual cost saves by end of 2015 | Launched mid 2015<br>On track to deliver $90-115 million annual pre-tax benefit by end of 2016 | Broad set of opportunities identified<br>Developing program targets and timing |
| <u>Expenses</u><br>■ **Salaries and benefits:** Market alignment of benefits, organizational redesign and reduction in FTEs — **~$120 million**<br>■ **Occupancy:** Branch optimization, surplus office exit — **~$20 million**<br>■ **Other:** Expand technology outsourcing model, vendor consolidation, IT application consolidation, strengthened sourcing, travel and A/V and enhance loss collection — **~$60 million** | <u>Revenue</u><br>■ **Revenue enhancements:** — **$30-40 million**<br>– Consumer distribution channel effectiveness<br>– Commercial and Consumer cross-sell<br>■ **Pricing:** Improve customer pricing methodology to better align with competitive landscape — **$20-25 million**<br><u>Expense</u><br>■ **Efficiency:** Operations transformation and vendor management — **$40-50 million** | Program is focused on efficiencies, balance sheet management, cross-sell and tax rate. |

Citizens Financial Group, Inc. 7

72. With respect to the Citizens Checkup program the June 1, 2016 presentation stated that TOP II was "[d]esigned to target Affluent/Mass Affluent customer" and had "[c]ontacted over 327K customers with 82K appointments booked."




73. As the bottom of the slide noted, the emphasis of Citizens Checkup and the Company's attempts to improve digitization and network revitalization was to be "[f]ocused on driving enhanced cross sell and improved customer experience."

74. The June 1, 2016 presentation also presentation stated that the Company hoped to "deepen" its share of the 789,000 Mass Affluent consumer banking households with $191 billion in possible deposits and investments through the Citizens Checkup strategy and Platinum accounts. Indeed Citizens noted in the June 1, 2016 presentation that 30% of customer households met the Company's target mass affluent segment for Checkup. The Company viewed this as a "[h]ighly attractive client base with significant opportunity to increase client penetration and share of wallet."

75. According to the June 1, 2016 presentation, its mass affluent customer households invested $25.6 billion at Citizens in deposits and investments, while depositing $165.4 billion in deposits and investments at other firms. Therefore, the Company noted that the mass affluent segment invested only 13% of its total deposits and investments with Citizens and that the

"Opportunity from 1% increase in Off-Us Balances" would be $1.7 billion. Accordingly, even a modest "deepening" of Citizen's share of the "investment wallet" with existing Citizens clients was identified as Citizens' "biggest growth opportunity":

**Deepening share with existing Citizens clients is biggest growth opportunity**

$s in billions

**Modest wallet share gains offer opportunity to generate balance growth**

**Deposit and Investment Balances, Existing Consumer Banking Households[1]**




| | | | |
|---|---|---|---|
| **Segment** *(# of HHs)* | **Mass Affluent** *(789K)* | **Affluent** *(432K)* | **High Net Worth** *(106K)* |
| **Strategy/ Product Offering** | Deepen Through Citizens Checkup/Platinum | Deepen Through Premier | Deepen Through Private Bank |
| **Primary Advisors** | Licensed Banker & FC | Premier Banker & FC | Private Bank |
| **Share of Deposits /Investments[1]** | 13% | 8% | 4% |
| **Opportunity from 1% Increase in Off-Us Balances[2]** | $1.7B | $3.9B | $4.6B |

1) Internal CFG data as of Sep 2015; wallet segment definitions from IXI; Company data/analysis.
2) Represents 1% share of existing CFG client deposit and investment balances held at other firms.

Citizens Financial Group, Inc. 12

76. Indeed, the June 1, 2016 presentation broke down the Company's "product penetration" rates among various products by its total deposit household and identified "19 possible cross-sell categories counted across both products and services." According to the June 1, 2016 presentation, the Company's goal was to increase non-branch deposit transactions from 31% in 2015 to 42% in 2016.




77. The June 1, 2016 presentation concluded by stating that this was a "large wealth opportunity" and that the Company needed to "[a]ccelerate the growth of clients into our value proposition in order to deepen product penetration and share of wallet and drive fee income growth." The June 1, 2016 presentation showed a chart of various competitors, with Citizens at the bottom with a ratio of only 0.13% of wealth fees to earning assets ratio. By comparison, the peer average was a ratio of 0.38% and the top performing bank, M&T Bank had a ratio of 0.59%. Noting this, the Company emphasized its strategy of strengthening sales processes to drive more managed accounts through Citizens Checkup.




78. The above statements identified in ¶¶69-77 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

79. On July 21, 2016, the Company announced its second quarter 2016 earnings and filed a Current Report on Form 8-K with the SEC, hosted a conference call with investors and analysts, and attached an earnings release presentation dated July 21, 2016 as an exhibit ("July 21, 2016 presentation"). In its earnings release entitled, "Citizens Financial Group, Inc. Reports

Second Quarter Net Income of $243 Million; Diluted EPS of $0.46 up 31% from second quarter 2015", the Company announced that Update on Plan Execution" the Company stated, in relevant part:

**Update on Plan Execution**

- Continued progress on initiatives to drive growth and enhance efficiency.
- Consumer Banking – New customer checking account households up ~3,000 from second quarter 2015 with growth of 3% in average deposits and 5% in service charges and fees. Solid progress on salesforce expansion in both Wealth Management and Mortgage Banking.
- Commercial Banking – Continued momentum with 11% average loan growth from second quarter 2015 with strength in Commercial Real Estate, Industry Verticals, Corporate Finance, Franchise Finance and Mid-corporate; Treasury Solutions fee income up 16% from second quarter 2015. Delivered strong results in Capital and Global Markets with improved client penetration and market share gains.
- Incremental revenue and efficiency initiatives are tracking as planned.
- Balance sheet optimization initiatives to improve low-cost core deposit growth and shift loan portfolio mix to higher-return categories progressing well.
- Closed TDR Transaction in third quarter 2016 at a pre-tax gain of approximately $70 million, improving underlying credit quality while providing opportunity for improved risk-adjusted returns.
- TOP II initiatives are performing well, as we remain on track to deliver $90 - $115 million of pre-tax benefits in 2016 with expense savings fully realized and revenue initiatives well underway.
- TOP III initiatives are projected to deliver 2017 pre-tax revenue and expense benefits of $73-90 million and $10-$15 million of tax benefits. These will help to fund continued investments to drive future growth, particularly in our fee-based businesses.
- Expect to utilize approximately 30% to 40% of the TDR Transaction gain to fund costs associated with TOP III initiatives as well as other balance sheet optimization efforts.

80. During the July 21, 2016 conference call, Defendant Van Saun stated, "

> But more than that, also making sure that we are playing on the basis where we can take in deposits and we can get the fee cross-sell.
>
> And so that's one of the things that we are constantly looking at trying to rotate is if there is an area, for example, the leasing business that we have is a bit light on fees and light on deposits, and it had been a referral business that we were really dependent on RBS for large ticket referrals. We're refashioning that business into something that's more focused as a cross-sell product into middle market customers so we can make it part of this whole relationship. So that is some of the continuing work that is taking place.

81. The July 21, 2016 presentation touted the Checkup program's success and estimated a $15-$20 million "2016 targeted pre-tax benefit" from the program. Defendants further touted that " "Citizens Checkup" rolled out to all branches and exceeding expectations on quality of customer engagement and satisfaction. Continuing to drive to business case levels of 1-2 incremental sales per branch per week, though sales skewed towards recurring revenue so taking longer to achieve run rate."

**TOP II has delivered well across revenues and expenses**

**Current estimate is to deliver $95-100 million benefit in 2016**

| Category | Name | Description | 2016 targeted pre-tax benefit: Revenue | 2016 targeted pre-tax benefit: Expense | Progress to date |
|---|---|---|---|---|---|
| Efficiencies | Operations Transformation | Refine operating model to simplify organization, reduce costs, improve service levels and enhance controls | | $25-$30 | • Executed operating model changes in 2015. Achieved full run-rate savings in 2Q15. |
| | Procurement | Achieve cost-reduction opportunities through further vendor-management consolidation and tighter standards | | $15-$20 | • 2016 run-rate savings complete in 2016. Driven by reduction in external resources and tightening of internal travel and office supplies policies. |
| Pricing | Commercial Lending/ Treasury Services | Improve customer pricing methodology to better align with competitive landscape; utilizing enhanced client segmentation | $20-$25 | | • Commercial pricing initiatives have been fully implemented resulting in average lending pricing up-lift of 10%+.<br>• Treasury Services has re-priced ~12,000 accounts and increases are tracking to expectations. |
| Revenue enhancements | Consumer distribution channel effectiveness | Launch effort to improve branch and contact center sales effectiveness, with the goal of deepening customer relationships | $15-$20 | | • "Citizens Checkup" rolled out to all branches and exceeding expectations on quality of customer engagement and satisfaction. Continuing to drive to business case levels of 1-2 incremental sales per branch per week, though sales skewed towards recurring revenue so taking longer to achieve run rate. |
| | Commercial and Consumer | Develop improved high-value customer-retention programs and enhanced tools and analytics to improve cross-sell efforts | $15-$20 | | • Commercial: Launched new tools to prioritize opportunities and enhanced sales routine to ensure product partner alignment, resulting in Middle Market pipeline at 2x historical level.<br>• Consumer Retention: Continued progress on improving pricing of deposits. Platinum experience and the Home Equity Retention Unit were launched in June; early results are positive. |
| Total | | | $50-$65 | $40-$50 | |

$90-$115

19

82. The above statements identified in ¶¶79-81 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

83. On September 14, 2016, Defendant Van Saun presented to investors and analysts at the Barclays Global Financial Services Conference. The presentation deck was also attached to a Current Report filed with the SEC on Form 8-K on September 14, 2016 ("September 14, 2016 presentation").

84. The September 14, 2016 presentation listed the Checkup program as part of a "Tapping Our Potential (TOP) program" with a revenue target of ~$50-$65 million. The September 14, 2016 presentation also stated that over 160,000 Checkup appointments had been booked to date:




85. The September 14, 2016 presentation touted the Consumer banking segment's "strong loan growth" of 6.5% from second quarter 2015 through second quarter of 2016 and 6.1% revenue growth from the same period. The Company attributed this growth, in part, to "driving product innovation and marketing strategies" that included Citizens Checkup as well as improved cross-sell outcomes.




86. In the appendix of the September 14, 2016 presentation, the Company again included a chart of various competitors, with Citizens at the bottom with a ratio of only 0.13% of wealth fees to earning assets ratio compared to the peer average ratio of 0.38%. The Company again emphasized its strategy of strengthening sales processes to drive more managed accounts through Citizens Checkup.




87. The above statements identified in ¶¶83-86 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

88. On October 21, 2016, the Company issued a press release entitled "Citizens Financial Group, Inc. Reports Third Quarter Net Income of $297 Million; Diluted EPS of $0.56."

Therein, the Company, in relevant part, stated:

**<u>Update on Plan Execution</u>**

- Continued progress on initiatives to drive growth and enhance efficiency.

- Consumer Banking – Performance paced by solid deposit and loan growth, improvement in conforming mortgage volume and strong salesforce expansion, with a record 47 net mortgage loan officer hires during the quarter as well as 11 financial consultants, resulting in nearly 500 mortgage originators and 350 financial consultants at quarter end. ***Our needs-based approach for serving retail customers, Citizens Checkup, has resulted in approximately 275,000 scheduled appointments year to date with high levels of customer satisfaction.***

- Commercial Banking — Delivered strong results in Capital Markets, foreign exchange and interest rate products. Generated 11% average loan growth from the year-ago quarter, reflecting continued progress in Mid-corporate and Industry Verticals, Commercial Real Estate and Franchise Finance. Treasury Solutions fee income up 10% from third quarter 2015.

- Continue to deliver on efficiency and balance sheet optimization strategies.

  - Tapping Our Potential ("TOP") initiatives remain on track; TOP II is delivering $95 million to $100 million of pre-tax benefits in 2016, while TOP III continues to project pre-tax revenue and expense benefits of $73 million to $90 million and $10 million to $15 million of tax benefits by the end of 2017.

  - Initiatives to shift loan portfolio mix to higher-return categories continue to progress well; extracting capital from TDR and aircraft lease portfolios; managing deposit pricing to minimize cost while achieving growth objectives.

89. Also on October 21, 2016, the Company filed a Current Report on Form 8-K with the SEC and attached an earnings release presentation dated October 21, 2016 as an exhibit entitled "3Q16 Financial Results" ("October 21, 2016 presentation"). The October 21, 2016 presentation touted the Checkup program's success as having "resulted in ~275,000 scheduled appointments YTD".

90. The October 21, 2016 presentation listed the Checkup program as part of a "Tapping Our Potential (TOP) program" with a revenue target of ~$50-$65 million, and that the TOP II Program was "[o]n track to deliver $95-$100 million annual pre-tax benefit by end of

2016. The October 21, 2016 presentation also stated that Citizens Checkup had "***[l]aunched with over 175k customer appointments kept to-date***; customer satisfaction has been positive with 78% very to completely satisfied."

**Self funding necessary investments through our efficiency initiatives**

Tapping Our Potential (TOP) programs remain on track

**TOP II Program**

Launched mid 2015 — On track to deliver
$95-$100 million annual pre-tax benefit by end of 2016

Revenue initiatives **Target ~$50-$65 million**

- **Citizens Checkup:** Launched with over 175k customer appointments kept to-date; customer satisfaction has been positive with 78% very to completely satisfied
- **Consumer Retention:** Initiative underway and showing strength in deposit retention; successful platinum launch driving retention with the Mass Affluent customer segment
- **Middle Market Share of Wallet:** Opportunity pipeline remains ~2X larger than historical levels[1] leading to stronger capital markets penetration
- **Commercial Pricing:** Re-priced 12,000 cash management accounts; improved loan pricing discipline and increased lending revenue by 12% and improved IRP spreads[2]

Expense initiatives **Target ~$40-$50 million**

- **Operations Transformation:** Streamlining of organization complete; focused on next wave of opportunities
- **Supply Chain Services:** 2016 run-rate savings achieved driven by reduction in external resources and tightening of internal travel and office supplies policies

**TOP III Program**

Launched mid 2016 — Targeted run-rate
benefit of $90-$110 million by end of 2017

Revenue initiatives **Target ~$22-$30 million**

- **Commercial Attrition:** Predicative tool in now in the hands of our RMs that identifies at risk clients and allows them to proactively develop retention plans for those clients
- **Unsecured Lending:** Initiative launched with good initial customer responses; early read on performance is positive
- **Business Banking Share of Wallet:** Realignment of sale force complete; executing on plans to deepen relationships

Expense initiatives **Target ~$51-$60 million**

- **Consumer Efficiencies:** First phase of streamlining non-revenue staff is complete; focus on branch optimization and efficiencies in the mortgage business
- **Commercial Efficiencies:** Streamlining end-to-end processing and portfolio management; actions are largely complete
- **Functional Efficiencies:** Good progress on reengineering processes; streamlining forecasting and reporting in finance and recruiting and training in HR
- **Fraud:** Project underway; initial focus on improving algorithms and enhancing chargeback processes

Tax efficiencies **Target ~$17-$20 million[3]**

- **Tax-Rate Optimization:** Aligning tax rate to peer levels beginning to see benefit in 3Q16; seeing strength in investment and historic tax credits

1) Represents opportunities per product specialist as of April 2016 vs. March 2015.
2) Improved lending revenue and IRP (interest-rate product s) pricing on In-scope deals which exclude syndicated transactions and select franchise finance customers.
3) $17-$20 million pre-tax benefit; Noninterest income impact ($20) to ($25) million; tax expense benefit of $30 to $40 million.

Citizens Financial Group, Inc. 18

91. On October 21, 2016, Defendant Van Saun also appeared on Bloomberg TV to discuss third quarter earnings results. The Bloomberg anchor, Scarlett Fu asked Defendant Van Saun about potential cross-selling issues and he expressed confidence in the Company's compliance efforts, stating:

> FU: OK. Well, within the banking sector along with the theme of better result this past quarter, we were also looking at the fallout from the Wells Fargo fraudulent account scandal. And we've heard from lenders like BB&T and U.S. Bancorp saying that they both undertook internal reviews to make sure that there isn't anything inappropriate going on, there isn't any kind of cross selling type issues. Have you done some things similar at Citizens?
>
> VAN SAUN: Yeah. I think we've been doing this all along.
> So our approach starts. We have a needs based approach to the customer. So we're running something called Citizens checkup, which is very similar to an

> annual physical where we invite our customers to come in and talk to us so we really understand their needs and their situation in life and their objectives. And we look to see how best we can help them.
>
> ***We also have, I think, a very strong tone at the top. We have good training in our people, good compliance, efforts, we have guard rails around some of the incentive payout structures. So we -- we periodically review that, but we feel pretty good about where we're situated.***

92. The above statements identified in ¶¶88-91 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

93. On December 7, 2016, the Company filed a Current Report on Form 8-K with the SEC and attached a presentation for Defendant Van Saun to present at the Goldman Sachs U.S. Financial Services Conference dated December 7, 2016 as an exhibit ("December 7, 2016 presentation").

94. The December 7, 2016 presentation listed the Checkup program as part of a "Tapping Our Potential (TOP) program" with a revenue target of ~$60-$65 million, and that the TOP II Program was "[o]n track to deliver $95-$100 million annual pre-tax benefit by end of 2016. The December 7, 2016 presentation also stated that Citizens Checkup had ***"[l]aunched with more than 210k customer appointments kept to-date***; customer satisfaction has been positive with 78% very to completely satisfied."




95. The December 7, 2016, presentation also highlighted the Consumer banking segment's "strong loan growth" of 6.6% from third quarter 2015 through third quarter of 2016 and 7.5% revenue growth from the same period. The Company attributed this growth, in part, to "driving product innovation and marketing strategies" that included Citizens Checkup as well as improved cross-sell outcomes.




96. In the appendix of the December 7, 2016 presentation, the Company again included a chart of various competitors, with Citizens at the bottom with a ratio of only 0.12% of wealth fees to earning assets ratio compared to the peer average ratio of 0.37%. The Company again emphasized its strategy of strengthening sales processes to drive more managed accounts through Citizens Checkup.




97. The above statements identified in ¶¶93-96 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

98. On January 20, 2017, the Company issued a press release entitled "Citizens Financial Group, Inc. Reports Fourth Quarter Net Income of $282 Million and Diluted EPS of $0.55." Therein, the Company, in relevant part, stated:

**Update on Plan Execution**

Consumer Banking

- Performance paced by solid loan growth with continued traction in student, other retail unsecured and mortgage loans, with improved consumer loan yields tied to the benefit of improved mix.

- Sales force expansion continued in 2016 with an increase of 96 mortgage loan officers to 538 at year end, with 43 in fourth quarter, and the addition of 42 financial consultants to 362 at year end, with 12 in fourth quarter.

- Citizens Checkup, our needs-based approach for serving retail customers, has resulted in approximately 400,000 scheduled appointments in 2016, with high levels of customer satisfaction.

Commercial Banking

- Delivered solid performance across most fee activities led by Capital Markets, Treasury Solutions and Interest Rate Products. Generated 10% average loan growth from the year-ago quarter, reflecting strength in Mid-corporate and Industry Verticals, Commercial Real Estate and Franchise Finance. Delivered total average deposit growth of 20% versus the prior-year quarter.

Efficiency and balance sheet optimization strategies

- Tapping Our Potential ("TOP") initiatives remain on track. In 2016, TOP II delivered approximately $105 million of annual pre-tax benefits. TOP III is expected to deliver pre-tax revenue and expense run-rate benefits of $100 million to $115 million, including $20 million of tax benefits in 2017.

- Initiatives to shift loan portfolio mix to higher-return categories continue to deliver benefits to portfolio yields; have extracted capital from TDR and aircraft lease portfolios; managing deposit pricing to minimize cost while achieving growth objectives.

Full-Year 2016 vs. Full-Year 2015

- Total revenue of $5.3 billion increased $431 million, or 9%, and Adjusted revenue growth* of 8% driven by strength in net interest income, reflecting 8% average loan growth and an 11 basis point improvement in net interest margin.

- Noninterest expense and Adjusted noninterest expense* increased 3%, with positive operating leverage of 4.2%.

- Efficiency ratio of 64% improved 376 basis points; 260 basis points on an Adjusted basis.*

- Net income increased 24% with Adjusted net income* up 18%.

- ROTCE of 7.7%, with Adjusted ROTCE of 7.6% higher by 91 basis points.*

99. Also on January 20, 2017, the Company filed a Current Report on Form 8-K with the SEC and attached an earnings release presentation dated January 20, 2017 as an exhibit entitled "4Q16 and FY2016 Financial Results" ("January 20, 2017 presentation"). In the January 20, 2017 presentation, the Company said that the Checkup program "helped drive ~400,000 appointments in FY16 with focus on deepening relationships with mass affluent and affluent customers."

100. The January 20, 2017 presentation listed its Consumer Banking initiatives in the presentation, touting "Solid deposit and loan growth, improvement in conforming mortgage volume, and strong sales force expansion, with a record 43 net mortgage loan officer hires during the quarter, as well as 12 financial consultants. Checkup has resulted in ~400,000 scheduled appointments YTD."

101. The January 20, 2017 presentation also listed the Checkup program as part of a "Tapping Our Potential (TOP) program" with a revenue initiative that delivered over $60 million and that the TOP II Program "[d]elivered $105 million in annual pre-tax benefit for 2016." The January 20, 2017 presentation also stated that Citizens Checkup had "[l]aunched with ~400,000 appointments scheduled to-date; customer satisfaction has been positive with 78% very to completely satisfied."

## Self funding necessary investments through our efficiency initiatives

**Tapping Our Potential (TOP) programs remain on track**

### TOP II Program

Launched mid 2015 — Delivered $105 million in annual pre-tax benefit for 2016

**Revenue initiatives** — Delivered over $60 million

- **Citizens Checkup:** Launched with ~400,000 appointments scheduled to-date; customer satisfaction has been positive with 78% very to completely satisfied
- **Consumer Retention:** Initiative underway and showing strength in deposit retention; successful platinum launch driving retention with the Mass Affluent customer segment
- **Middle Market Share of Wallet:** Opportunity pipeline remains ~2X larger than historical levels[(1)] leading to stronger capital markets penetration
- **Commercial Pricing:** Re-priced 12,000 cash management accounts; improved loan pricing discipline and increased lending revenue by 13% and improved IRP spreads[(2)]

**Expense initiatives** — Delivered ~$40 million

- **Operations Transformation:** Streamlining of organization complete; focused on next wave of opportunities
- **Supply Chain Services:** 2016 run-rate savings achieved driven by reduction in external resources and tightening of internal travel and office supplies policies

### TOP III Program

Launched mid 2016 — Targeted run-rate benefit of $100-$115 million by end of 2017

**Revenue initiatives** — Target ~$25-$30 million

- **Commercial Attrition:** Predictive tool is now in the hands of our RMs that identifies at-risk clients and allows them to proactively develop retention plans for those clients
- **Unsecured Lending:** Initiative launched with good initial customer responses; early read on performance is positive
- **Business Banking Share of Wallet:** Realignment of salesforce complete; executing on plans to deepen relationships

**Expense initiatives** — Target ~$55-$65 million

- **Consumer Efficiencies:** First phase of streamlining non-revenue staff is complete; focus on branch optimization and efficiencies in the mortgage business
- **Commercial Efficiencies:** Streamlining end-to-end processing and portfolio management; actions are largely complete
- **Functional Efficiencies:** Good progress on reengineering processes; streamlining forecasting and reporting in finance and recruiting and training in HR
- **Fraud:** Project underway; initial focus on improving algorithms and enhancing chargeback processes

**Tax efficiencies** — Target ~$20 million[(3)]

- **Tax-Rate Optimization:** Aligning tax rate to peer levels; began to see benefit in 3Q16 and showing strength in investment and historic tax credits

1) Represents opportunities per product specialist as of December 2016 vs. March 2015.
2) Improved lending revenue and IRP (interest-rate products) pricing, as well as improved lending revenue on in-scope deals, which exclude syndicated transactions, select franchise finance customers, asset-based lending deals and letters of credit.
3) ~$20 million pre-tax benefit; noninterest income pre-tax impact ~($20) million; tax expense benefit of ~$40 million on a pre-tax equivalent basis.

Citizens Financial Group, Inc.

21

102. The January 20, 2017 presentation also stated that the "Citizens Checkup program continues to yield results" and noted that its "Needs-based approach adds value through service and helps build and maintain relationships."

103. The above statements identified in ¶¶98-102 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a

reasonable basis.

104. On March 17, 2017, the Company published its fiscal year 2016 annual report. Therein, the Company claimed that "[i]n 2016, we continued to enhance our products and services to provide more customer-centric offerings," including "[e]volving our branch network and outreach efforts — modernizing our retail branch network to better meet customers' advisory needs, in conjunction with our Citizens Checkup program designed to assist customers with needs-based financial reviews to build and deepen relationships." The Company also claimed it had "~400,000 Citizens Checkup appointments to assess customer financial needs."

105. The above statements identified in ¶104 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's bankers were directed to make an unrealistic number of Citizens Checkup calls and appointments; (2) that many customers were not interested in the Citizens Checkup program and often did not show up for appointments; (3) that bankers and managers were directed and/or pressured to inflate the number of calls and appointments scheduled and kept; (4) that, as a result, the Company's reported Citizens Checkup figures were inflated; (5) that the Company lacked adequate internal controls to prevent and detect such inflated metrics; and (6) that the Citizens Checkup program's revenue-driving potential was false and misleading and/or lacked a reasonable basis.

**<u>The Truth Is Revealed</u>**

106. On March 29, 2017, The Wall Street Journal ("WSJ") reported that the Company implemented a program that invited customers into branches for a financial checkup (or "Citizens Checkup") and that the Company claimed 400,000 such meetings occurred in 2016, but that eleven current and former Citizens branch employees in five states claimed that information about some meetings was fabricated by those employees or others as they struggled to meet goals set by the bank. In greater part, the WSJ reported:

> As part of its turnaround plan, Citizens Financial Group Inc. has touted a program that invites customers into branches for what the bank calls a financial checkup. It

said 400,000 such meetings were scheduled last year.

Eleven current and former Citizens branch employees in five states claim that information about some meetings was fabricated by those employees or others as they struggled to meet goals set by the bank.

"For a week or so, I had my bankers [try to make] real appointments. No one was picking up the phone," said a former branch manager in Massachusetts, recalling when the "Citizens Checkup" program was introduced in February 2016. "So we put random people's names down and said, 'We have an appointment.'"

After a fake appointment was supposed to have occurred, bankers sometimes marked that the customer didn't show up or attended but didn't sign up for any new products, the former employees said. One former Citizens branch manager in New York state recalled putting stars or exclamation points on falsified forms to make them look like authentic meeting notes.

***Citizens said in a statement that it has "no data to suggest that any aspect of the Citizens Checkup program was fabricated or falsified" and has "strict controls and standards to ensure that inappropriate behavior is detected and addressed."***

Brad Conner, head of consumer banking at Citizens, also said in a separate statement that, "We take every allegation seriously, and our chief conduct officer will lead a thorough review."

The bank added any new program entails change and that, "as expected, a small number of colleagues have struggled in making the transition to having deep needs-based conversations."

The former Citizens employees said they falsified information because of pressure to meet expectations related to the program and time constraints from other banking responsibilities. They also said they believed that doing so wouldn't hurt customers.

In response, Citizens said, "While all of our colleagues go through significant training to be prepared for conducting a checkup, this new approach may not suit everyone, which may explain why you identified a handful of detractors."

Providence, R.I.-based Citizens has more than $149 billion in assets and 1,200 branches in 11 states, primarily in the Northeast; it is the 10th-largest U.S. commercial bank by total assets. Since going public in 2014, Citizens, a former unit of Royal Bank of Scotland Group PLC, has worked to turn around its business by improving profitability and increasing revenue.

Banks, investors and regulators have been scrutinizing bank-sales programs since a scandal over sales tactics erupted last fall at Wells Fargo & Co. Some firms

have downplayed sales goals since then, though Citizens has continued to emphasize its appointment program and other sales goals, according to current and former employees.

In late March, bankers in Pennsylvania learned that they were expected to up their number of checkup appointments in April. The bank said "there was no formal raising of appointment expectations that we are aware of and no monthly targets are set across the bank."

The information that the current and former Citizens employees said was falsified doesn't involve opening customer accounts without consent, the practice that led to Wells Fargo's problems. That bank entered into a $185 million settlement over its sales practices and the public fallout led its chief executive to abruptly retire. But the claims by current and former employees that information was falsified at Citizens could raise questions about the accuracy of data the bank presented to investors and about the bank's corporate culture and internal controls.

"Investors are potentially hurt if executives go out and talk to the Street about basically phantom appointments that don't exist," said Clifford Rossi, a professor at University of Maryland's business school and a former bank-risk management executive.

The appointment-setting program was part of a broader push to bring in more than $60 million in new revenue for 2016. Citizens had total revenue of $5.3 billion last year. Last June, Mr. Conner told investors at a conference that the initiative was "near the top of the things that we're most excited about."

Mr. Conner added at that time, "We've contacted over 300,000—about 325,000 of our customers. We've been able to schedule 80,000 appointments for a checkup, and we're getting really great feedback from both our customers and our colleagues in terms of the receptivity from our customer base."

Citizens has also presented data on the appointments in materials accompanying quarterly earnings. The bank told The Wall Street Journal that figures on the program presented to investors weren't overstated and that those metrics were "not a key financial measure."

To make appointments, Citizens' staffers cold-call customers, the bank said. The goal, current and former employees said, was to eventually sell more banking products. When meetings occurred, bankers were told to ask questions such as: "Are you a caretaker for an aging parent?" or "Are you planning for an upcoming divorce?"

Citizens' push for customer appointments reflects Chief Executive Bruce Van Saun's stated desire for branches to become advice centers.

The bank said a two-part phone survey—conducted first in late 2015 during a pilot of the program and from late 2016 to early 2017—of nearly 1,000 customers

who were called for a checkup appointment found 95% who kept the appointment said the meeting was useful. The bank also said in response to questions from the Journal that surveys of its own branch employees haven't turned up evidence of widespread staff dissatisfaction with the checkups.

The 11 current and former branch employees, however, said the program ran into problems. For starters, few customers picked up the phone—and of those that did, not many wanted an appointment, the bankers said.

A former Citizens banker in New York state said he was initially enthusiastic after going through specialized training. But no matter how he pitched it in calls in the spring of 2016, "people still felt it was a telemarketer call," said the banker. "We feel good about our sales practices, and the checkup approach is an important element of why we do," the bank said.

Bankers, who were often told by managers to make 25 cold calls a day, were given a script, some of the current and former bankers said. This included wording to "overcome objections" to a potential meeting, according to a copy of the script reviewed by the Journal. If a customer wasn't interested, the bank suggested in the script that the banker say: "Just like you would meet with a doctor or dentist every six months or year it is important to review your financial health as well."

At some branches, calls were expected to yield between 10 and 15 checkup appointments per banker per week, some of the current and former bankers said. These appointments were tracked as part of a performance-measurement system.

Bankers said there was an intense focus on checkup appointment statistics. "Corporate only looked at the numbers," another former New York state banker said. "As long as those numbers looked presentable, the pressure was off." Like other former employees, this banker said the false appointments would help bankers "look good without any customers being hurt."

The bank disputes the goal figures for calls and appointments. It said that, while individual branches set their own expectations, it is more typical for 30 calls and two kept appointments a week to be expected of bankers.

Nine current and former employees said they or others would typically enter false information into two computer systems, one tracking calls to customers, the other for appointments made, former bankers said. First, employees would mark that they called customers even though they hadn't. Next, the employees said, they or others would enter fake appointments into the system using the names of actual customers.

Two former Citizens bankers said they often marked that a customer didn't show up for the checkup or didn't buy any products. Some bankers said they pulled up

customer financial records so they could create believable answers to put on paper forms about the supposed meetings.

The bank said it had worked with a consultant to track the progress of its program against those of other banks with similar arrangements. It added this didn't show anything amiss.

One former banker said there was encouragement from managers to lie about calls and appointments by their managers. "We didn't have any time to make calls," one former banker in Rhode Island said. This banker estimated making four real "checkup" calls over the course of 2016 but reported making hundreds within the bank's system, the banker said. "We were told how many appointments we would have to have and how many contacts we had to make it believable by the branch manager," the person said.

The bank responded that "checkup activities are governed by strong controls to ensure that numbers are accurate, with close oversight at various levels starting with the branch managers up to executive management."

107. On this news, the Company's stock price declined $0.54 per share to close at $34.49 per share on March 29, 2017, on unusually heavy trading volume.

**Post-Class Period Actions: Defendants Stop Reporting on Citizens Checkup**

108. On April 20, 2017, the Company issued a press release entitled "Citizens Financial Group, Inc. Reports First Quarter Net Income of $320 Million and Diluted EPS of $0.61." Therein, the Company, avoided citing any specifics about the Citizens Checkup program, stating:

**Update on Plan Execution**

Consumer Banking

- Performance paced by solid loan growth with continued traction in education, mortgage and unsecured retail, along with increased loan yields, reflecting improving mix and higher rates.

- Wealth management business continues to build scale and add capabilities, with fee income growth up 13% versus fourth quarter 2016. Positive trend continues in migrating sales mix from transaction to fee-based sales.

- Mortgage loan officer recruiting continues to track well, with an increase of 22 mortgage loan officers in the quarter to 560.

- We continue to see strong momentum in our efforts to use the Citizens Checkup program to build and deepen relationships with our Consumer customers.

- Customer satisfaction remains high and program metrics continue to track well against expectations.

109. Also on April 20, 2017, the Company filed a Current Report on Form 8-K with the SEC and attached an earnings release presentation dated April 20, 2017 as an exhibit entitled "1Q17 Financial Results", the Company said that the Checkup program "continues to help build stronger relationships with customers and maintains high levels of customer satisfaction."

110. Also on April 20, 2017, the Company held an earnings conference call with investors and analysts to discover earnings results for the 2017 fiscal first quarter. During the call, Defendant Conner defended the Checkup program, stating:

> We have confidence in the Checkup program as an important part of our strategy to serve customers well and ultimately be better positioned to deepen relationships. We believe it's important to note that recent media coverage did not suggest customer harm nor have we identified any. Nevertheless, we have commenced a thorough review to determine whether there are any issues in delivery of the program. Our current expectation is that we are in a good position based on feedback and survey results we already have. Our surveys show that customers who go through the review are highly satisfied and most would recommend the Checkup to someone else. An engagement and organizational health index of our branches is up, customer alignment is up and turnover is down since we moved to this mode of interaction with our branch-based customers. However, we're open to things we learn from the review that we can adjust to become even better.

111. After the earnings call on April 20, 2017, the *Wall Street Journal* published an article noting the Company had backed away from its previous assertion that there was "no data to suggest that any aspect of the Citizens Checkup program was fabricated or falsified."

> Citizens Financial Group Inc. said it still has confidence in its program of setting up thousands of appointments with retail clients, but stopped providing some data on the initiative to investors in its first-quarter earnings report.
>
> In March, The Wall Street Journal published an article detailing that 11 current and former Citizens branch employees in five states claimed that information about some meetings was fabricated by those employees or others as they struggled to meet goals set by the bank.
>
> The appointment-setting program is part of the Providence, R.I.-based bank's postcrisis turnaround plan. The program invites customers into branches for what the bank calls a financial checkup.

> On Citizens' earnings call Thursday, Chief Executive Bruce Van Saun didn't comment on the sales program but asked consumer-banking head Brad Conner to do so. Mr. Conner said Citizens still has "confidence" in the program, and that an internal review hasn't turned up instances where customers were harmed.
>
> He didn't repeat the bank's previous assertion that it had "no data to suggest" that information was fabricated. Mr. Conner said the bank will be open to learning about what "we can adjust to become even better." The bank also didn't provide data on the number of appointments made through the program, a figure it had provided in recent presentations.
>
> After the Journal story was published, Citizens bankers were asked to take a survey about the financial-checkup program. Some senior executives discussed the program and broader sales culture with retail employees, according to Citizens bankers.

## CLASS ACTION ALLEGATIONS

112. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Citizens' securities between March 18, 2016, and March 29, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

113. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Citizens' common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Citizens shares were traded publicly during the Class Period on the NYSE. As of February 1, 2017, Citizens had 509,107,893 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Citizens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

114. Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

115. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

116. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Citizens; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

117. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **UNDISCLOSED ADVERSE FACTS**

118. The market for Citizens' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Citizens' securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Citizens' securities relying upon the integrity of the market price of the Company's securities and market information relating to Citizens, and have been damaged thereby.

119. During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Citizens' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Citizens' business, operations, and prospects as alleged herein.

120. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Citizens' financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

121. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

122. During the Class Period, Plaintiffs and the Class purchased Citizens' securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

123. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Citizens, their control over, and/or receipt and/or modification of Citizens' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Citizens, participated in the fraudulent scheme alleged herein.

124. Additionally. the Company and its subsidiaries, including CCO Investment Services Corp. ("CCO") faced various SEC enforcement proceedings related to sales practice violations, including that of cross-selling practices. Since 2006, CCO has been fined more than $4.9 million by a series of federal and state securities regulators. Additionally, on October 21, 2013, the SEC instituted administrative proceedings pursuant to Section 203(f) of the Investment Advisers Act of 1940 (Advisers Act) against Stephen E. Gagnon, who was associated with CCO Investment Services Corp. for improperly terminating a customer's annuity with inappropriate investments.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

125. The market for Citizens' securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Citizens' securities traded at artificially inflated prices during the Class Period. On March 1, 2017, the Company's stock price closed at a Class Period adjusted high of $39.59 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Citizens' securities and market information relating to Citizens, and have been damaged thereby.

126. During the Class Period, the artificial inflation of Citizens' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Citizens' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Citizens and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

127. At all relevant times, the market for Citizens' securities was an efficient market for the following reasons, among others:

(a) Citizens stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Citizens filed periodic public reports with the SEC and/or the NYSE;

(c) Citizens regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Citizens was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

128. As a result of the foregoing, the market for Citizens' securities promptly digested current information regarding Citizens from all publicly available sources and reflected such information in Citizens' stock price. Under these circumstances, all purchasers of Citizens' securities during the Class Period suffered similar injury through their purchase of Citizens' securities at artificially inflated prices and a presumption of reliance applies.

129. A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

130. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Citizens who knew that the statement was false when made.

## **FIRST CLAIM**
## **Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
## **Against All Defendants**

131. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

132. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Citizens' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

133. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Citizens' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

134. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Citizens' financial well-being and prospects, as specified herein.

135. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Citizens' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Citizens and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

136. Each of the Individual Defendants' primary liability and controlling person

liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

137. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Citizens' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

138. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Citizens' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information

that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Citizens' securities during the Class Period at artificially high prices and were damaged thereby.

139. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Citizens was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Citizens securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

140. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

141. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

142. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

143. Individual Defendants acted as controlling persons of Citizens within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited

access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

144. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

145. As set forth above, Citizens and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 11, 2017

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
230 Park Ave., Suite, 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

-and-

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Kara M. Wolke
Elaine Chang
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff Ken Warner and the Proposed Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Sebastiano Tornatore
733 Summer Street, Suite 304
Stamford, CT 06903
Telephone: 203-992-4523
Facsimile: 212-363-7171
E-mail: shopkins@zlk.com

*Attorneys for Lead Plaintiff Richard Grace and the Proposed Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On September 11, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 11, 2017.

*s/ Lesley F. Portnoy*
Lesley F. Portnoy

# Mailing Information for a Case 1:17-cv-03004-GBD Warner v. Citizens Financial Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lee A. Armstrong**
  laarmstrong@jonesday.com,rwestrom@jonesday.com,nydocket@jonesday.com
- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Gregory Bradley Linkh**
  glinkh@glancylaw.com,info@glancylaw.com
- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)